**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ALEXIS D. CORNETT,**

      **Plaintiff,**

                                      **Civil Action 2:11-cv-00709**

**v.**                                    **Judge James L. Graham**

                                    **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiff, Alexis D. Cornett, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income. In her application, which Plaintiff filed on May 30, 2007, she alleges disability since December 9, 2005, due to fibromyalgia, headaches, irritable bowel syndrome ("IBS"), and acid reflux. (R. at 125–28, 167.)

After initial administrative denials of her claim, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on October 23, 2009. (R. at 28–46.) A medical expert and vocational expert also testified at the hearing. (R. at 47–62.) On July 27, 2010, the ALJ issued an unfavorable decision denying benefits. (R. at 11–18.) This decision became the final decision of the Commissioner when the Appeals Council denied review on June 17, 2011. (R. at 1–4.)

Plaintiff thereafter timely commenced this civil action.  In her Statement of Errors, Plaintiff contends that the ALJ erred in finding that Plaintiff's severe headaches are not disabling. Plaintiff also contends that the ALJ erred by failing to find Plaintiff's fibromyalgia to be a severe impairment.  Following the Commissioner's response in opposition, the matter is now ripe for decision.  For the reasons that follow, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was twenty-two years old at the time of the administrative hearing, has a high school education and no past relevant work.  (R. at 17, 29, 139, 168, 179–80.)

At the administrative hearing, Plaintiff testified that she lived with her parents and brothers.  (R. at. 28.)  Plaintiff reported that she had completed a few semesters of college in 2007 and also received a diploma in veterinary assistance through a career college in 2009.  (R. at 29–30)  At the time of the hearing, she was taking another course in dog and obedience training.  (R. at 29.)  Plaintiff testified that while attending college, she had poor grades because of concentration and memory problems due to her fibromyalgia and medications.  (R. at 30–31.) She took all of her courses through "distance learning," which involved completing her courses entirely on-line and through e-mail.  (R. at 40.)  At the time of the hearing, she was taking college courses so she could remain on her parents' insurance.  (R. at 43.)

Plaintiff indicated at the hearing that she had been grooming dogs with her mother for a little over two years.  (R. at 31.)  Plaintiff stated, however, that some weeks she would spend only a few hours performing this work, and other weeks she would spend no hours working.  (R. at 31.)  She also testified that she spent a few hours babysitting every couple of months.  (*Id.*)

2

She stated that she has not had any other type of employment since she graduated from high school.  (R. at 30–31.)

Plaintiff testified that her worst problem is her headaches.  (R. at 31–32.)  She reported that the headaches began when she was ten years old and have become progressively worse. (*Id.*)  Plaintiff indicated that she has a headache almost every day, but noted that they are often different in nature and severity.  (R. at 32.)  Plaintiff stated that stress and lack of sleep make her headaches worse.  (R. at 32–33.)  She said that various doctors have come up with different reasons for the headaches including rebound headaches, depression, and lack of sleep.  (R. at 33–35.)

Plaintiff also testified regarding her fibromyalgia.  (R. at 37.)  According to Plaintiff, her fibromyalgia makes her constantly fatigued, weak, and tender, and causes pain to different parts of her body on different days, including her hands, feet, knees, and back.  (*Id.*)  Plaintiff stated that medications do not help her fibromyalgia symptoms.  (R. at 38.)  Plaintiff also testified to suffering from irritable bowel syndrome.  (R. at 41.)

On a typical day, Plaintiff testified that she gets up around 9:00 a.m. and goes to bed at around 10:00 p.m.  (R. at 43.)  She reported reading and watching television to pass the time. (*Id.*)  She had a driver's license, but did not drive very often due to issues with concentration. (R. at 45.)  She ordinarily left the house only to go to church and doctor's appointments.  (R. at 46.)  Plaintiff suggested that a good day for her is when she does not have a really bad headache. (R. at 45.)  She indicated that she has good days two to three times a week.  (*Id.*)  Plaintiff testified that she has difficulty sitting or standing for more than 30 minutes at a time and cannot walk for more than 10 minutes before needing to rest.  (R. at 39.)  She had tried to exercise for

3

the fibromyalgia, but did not have the energy to do so.  (*Id.*)  She also described difficulty

gripping objects when her hands hurt.  (R. at 41.)

### III.  MEDICAL RECORDS

**A.    Treatment Notes**

In November 2003, when Plaintiff was 16 years old, neurologist Petre Udrea, M.D.,

evaluated her for headaches.  (R. at 251.)  Plaintiff reported a four to five year history of

headaches at this time.  (*Id.*)  Examination findings were generally normal.  (R. at 252.)  Dr.

Udrea noted that Plaintiff's prior laboratory test results and a CT scan were normal.  (*Id.*)  He

noted the possibility of vascular and/or tension-type headaches, and altered Plaintiff's

medication.  (R. at 252–53.)

Dr. Udrea saw Plaintiff for a follow-up examination in February 2004.  (R. at 248.)

Plaintiff reported that the medication did not provide any significant relief and that she continued

to experience headaches that reached up to an 8 or 9 on an analog pain scale.  (*Id.*)  Dr. Udrea

diagnosed Plaintiff as having headaches with migrainous features and adjusted her medication.

(R. at 248–49.)  Plaintiff continued to complain of headaches in May 2004.  (R. at 246.)  Dr.

Udrea encouraged Plaintiff to keep a journal describing her headaches.  (*Id.*)

In January 2005, Plaintiff presented to the Family Health Center with a history of

migraine headaches.  (R. at 263–64.)  She explained that although she had received treatment

from neurologists and family physicians, she had not experienced relief.  (R. at 263.)  A nurse

practitioner diagnosed her with migraines and altered her medication.  (R. at 264.)  A January

2005 MRI of Plaintiff's brain was normal.  (R. at 229.)  In March 2005, Plaintiff reported

worsening muscle and joint pains and indicated that she had trouble getting out of bed in the

morning. (R. at 256.) At this time, V. Yerramilli, M.D., diagnosed Plaintiff with chronic anemia and polyarthralgia. (*Id.*)

Julie Elder, D.O., first saw Plaintiff at the Cleveland Clinic in September 2005. (R. at 291–94.) Plaintiff indicated that her symptoms included joint pain, muscle pain, weakness, and dizziness. (R. at 291.) Dr. Elder diagnosed Plaintiff with myalgia and myositis, but noted that Plaintiff's clinical examination was inconsistent with fibromyalgia syndrome due to a minimal amount of tender points. (R. at 294.) Dr. Elder also diagnosed Plaintiff with headaches, fatigue, and depressive disorder. (*Id.*)

In November 2005, Plaintiff saw Stephen Samples, M.D., at the Cleveland Clinic due to her headaches. (R. at 288–90.) Plaintiff reported to Dr. Sample that she had daily headaches for as long as she could remember, but later indicated that she had been having daily headaches for about a year. (R. at 288.) Dr. Samples noted that during the examination, Plaintiff appeared indifferent about her disease process and acted bored. (R. at 289.) Dr. Samples diagnosed Plaintiff with transformed migraines with analgesic overuse. (*Id.*) He felt that Plaintiff's treatment for fibromyalgia might be exacerbating her headaches. (*Id.*) He adjusted her medication, and prescribed physical and infusion therapy. (*Id.*) He also noted that there appeared to be something "slightly amiss" about the situation and referred her for a psychological evaluation. (*Id.*)

On December 9, 2005, Plaintiff received treatment from John Carey, M.D., a rheumatologist at the Cleveland Clinic. (R. at 269–72.) After examining Plaintiff, Dr. Carey agreed with the diagnosis of fibromyalgia, noting that Plaintiff had "classic symptoms." (R. at 271.) Dr. Carey recommended that Plaintiff begin a graded exercise program and minimize her

medications with the goals of improved sleep and decreased pain.  (*Id.*)

Neurologist Praveen Giri, M.D., performed a consultive examination in August 2006.
(R. at 365.)  During the examination, Plaintiff complained of daily headaches that she indicated
could "last for days to weeks."  (*Id.*)  Dr. Giri felt that Plaintiff appeared to have vascular and
tension headaches as well as depression.  (*Id.*)  He also noted a history of fibromyalgia.  (*Id.*)  A
September 2006 EEG revealed mildly abnormal results "due to the occurrence of slow theta
activities . . . ."  (R. at 358.)

Plaintiff initially saw primary care physician, Scott Howard, D.O., in January 2007.  (R.
at 447–50.)  Plaintiff reported her medical history including daily headaches/migraines and
fibromyalgia.  (R. at 447.)  Dr. Howard recommended that Plaintiff continue with her neurologist
for treatment of her chronic headaches and he referred her to a rheumatologist for fibromyalgia.
(R. at 449.)

In July 2007, Plaintiff underwent a consultive examination with psychologist Thomas L.
Heiskell, Ph.D.  (R. at 392–96.)  At this time, Plaintiff reported that she babysat two to three
days a week for the entire day.  (R. at 395.)  Although Plaintiff generally did not drive, she
reported running errands with her mother and indicated that she could shop without her mother's
assistance.  (*Id.*)  Plaintiff stated that she went to church a couple times a week including for a
Bible study.  (*Id.*)  She assisted her mother with chores when asked and was able to prepare
meals for herself.  (*Id.*).  Her activities included reading, crafts, and taking pictures.  (*Id.*)  Dr.
Heiskell diagnosed Plaintiff with mild adjustment disorder with mixed emotional features.  (*Id.*)

Plaintiff treated with rheumatologist, Rajesh Kataria, D.O., from August 2007 to June
2008.  (R. at 474–85.)  Initially, Dr. Kataria noted that Plaintiff complained of pain all over her

body, restless sleep, and fatigue.  (R. at 484.)  Dr. Kataria diagnosed Plaintiff with fibromyalgia

and adjusted her medication regimen.  (*Id.*)  In September 2007, Dr. Kataria reported that

Plaintiff was in "slightly less pain overall" and was responding to her medication.  (R. at 481.)

Plaintiff, however, continued to complain of pain in her feet, hands, and low back in March

2008.  (R. at 478.)  Dr. Kataria again adjusted Plaintiff's medication dosage.  (*Id.*)  In June 2008,

Dr. Kataria noted that Plaintiff was "doing much better" on the higher dosage of medication,

though she continued to complain of constant pain.  (R. at 475.)

On September 4, 2007, Plaintiff presented to Dr. Howard complaining of sinus pressure

and headache for the past five days.  (R. at 435.)  She specifically reported "feeling pressure

above and below her eyes."  (*Id.*)  Dr. Howard diagnosed Plaintiff with acute sinusitis and

cirrous otitis media.  (R. at 436.)

The record contains treatment notes from gastroenterologist, Reshma Banerjee, D.O.,

dated from February 2008 to August 2009.  (R. at 430–31, 515–18.)  Dr. Banerjee, who treated

Plaintiff for irritable bowel syndrome, indicated that Plaintiff was not compliant with the diet she

recommended.  (R. at 430, 517.)

Neurologist, Hakin Hussein, M.D., began treating Plaintiff in November 2008.  (R. at

491–92.)  Plaintiff reported headaches that began at age 10 and had increased in frequency and

severity since that time.  (R. at 491.)  Dr. Hussein's neurological examination of Plaintiff was

within normal limits.  (*Id.*)  Dr. Hussein assessed "episodic migraine headache without aura that

has transformed into chronic daily headache most likely transformed migraine on top of

fibromyalgia syndrome."  (R. at 492.)

In February 2009, Plaintiff complained to Dr. Hussein of episodic headaches with

7

migraine features.  (R. at 512–13.)  She reported that her medication was not effective and rated

her headaches at a 5 to 6 on an analog pain scale.  (R. at 512.)  Dr. Hussein diagnosed Plaintiff

with chronic daily headaches, episodic migraine headaches, dizziness, and fibromyalgia

syndrome.  (*Id.*)  In June 2009, Dr. Hussein noted that Plaintiff had not responded to medication

for her chronic daily headaches.  (R. at 509.)  Plaintiff underwent a sleep study in August 2009,

which was negative for sleep apnea.  (R. at 501–08.)

On February 22, 2010, psychologist Alan White, Ph.D., conducted a psychological

evaluation of Plaintiff.  Plaintiff reported at the clinical interview that she occasionally babysat

and performed part-time dog grooming for her mother's business on a flexible, self-paced

schedule.  (R. at 525.)  Plaintiff indicated that she read and went to church three times a week.

(R. at 527.)  She reported doing the laundry, but noted that she does not assist in other chores.

(*Id.*)  Dr. White diagnosed Plaintiff with depressive disorder, but found that Plaintiff was only

mildly impaired in her ability to handle work stress, and not otherwise mentally impaired in her

work abilities.  (R. at 529–30.)

**B.    State Agency Evaluations**

In August 2007, state agency physician William Bolz, M.D., reviewed the record and

assessed Plaintiff's physical functioning capacity.  (R. at 419–26.)  Dr. Bolz opined that Plaintiff

could lift and carry fifty pounds occasionally and twenty five pounds frequently; stand and/or

walk about six hours in a workday; sit for about six hours in a workday; push and pull within

normal limits; and occasionally stoop or crouch.  (R. at 420–21.)  Dr. Bolz suggested that

Plaintiff was only partly credible regarding her complaints of fatigue and pain.  (R. at 424.)  Dr.

Bolz stressed that the objective evidence showed normal examinations with the exception of

irritable bowel syndrome.  (*Id.*)  He also noted Plaintiff's history of headaches.  (*Id.*)  In December 2007, state agency physician Anton Freihofner, M.D., affirmed Dr. Bolz's assessment.  (R. at 428.)

## IV. EXPERT TESTIMONY

### A.     Medical Expert

Stanton Fischer, M.D., certified as a general internist and pulmonologist, testified as the medical expert ("ME") at the administrative hearing.  (R. at 46–57.)  Dr. Fischer noted that this was a "complex case" and that Plaintiff had symptomatology with features that might require psychiatric evaluation.  (R. at 47.)  He summarized that Plaintiff had a long history of headaches and fibromyalgia, with repeated and extensive negative testing.  (R. at 48, 50.)  Dr. Fischer further explained that he considered Plaintiff's headaches and myalgia together in Listing 12.07, somatoform disorder.  (R. at 48.)   Dr. Fischer noted that although Plaintiff complained of fatigue, fatigue "is not characteristic of fibromyalgia."  (R. at 49.)  Dr. Fischer emphasized that extensive chemical analysis has been normal and all other studies have been negative.  (*Id.*)  Dr. Fischer opined that there was no evidence of a severe physical impairment and, from a physical perspective, Plaintiff could perform medium work.  (R. at 51–52.)

Upon questioning from counsel, Dr. Fischer testified that he was not saying Plaintiff's headaches did not exist, but instead that their cause was unexplained.  (R. at 55.)  Dr. Fischer admitted that in his practice he would generally refer patients with chronic headaches to a neurologist.  (R. at 56.)  Additionally, Dr. Fischer indicated that while only Plaintiff could tell whether her headaches would cause her to miss work, many people with headaches and severe migraines were able to maintain full-time employment.  (R. at 57.)

**B.     Vocational Expert**

 Kay Billery, testified at the administrative hearing as a vocational expert.  (R. at 58–62.)
She stated that Plaintiff has no past relevant work.  (R. at 59.)

The ALJ asked Ms. Billery to consider a person of Plaintiff's age, education, and work
experience who could perform a broad range of medium work, but was limited to never climbing
ladders, ropes, scaffolds, or balancing, and who could not drive as a part of any job.  (R. at 59.)
Ms. Billery concluded that such a person could perform jobs such as kitchen helper with 7,000 in
the State of Ohio ("state") and 500,000 nationally; laundry worker with 5,000 in the state and
over 300,000 nationally; and industrial cleaner with 5,000 in the state and over 200,000
nationally.  (R. at 60.)  When the ALJ reduced the hypothetical person to the light exertional
level, with the same restrictions, Ms. Billery testified that the hypothetical individual could
perform work as an office helper, with 2,500 jobs in the state and over 300,000 nationally; office
cleaner with 3,000 jobs in the state and over 500,000 nationally; and cashier with 4,000 state
jobs and 400,000 national jobs.  (*Id.*)

The ALJ then asked Ms. Billery to consider a person with the same basic restrictions
expect limited to the sedentary exertional level.  (R. at 61.)  Ms. Billery testified that the
hypothetical individual could perform jobs such as an appointment clerk, with 5,000 jobs in the
state, 500,000 national; order clerk with 1,500 jobs in the state and 180,000 national; and charge
account clerk with 1,000 jobs in the state and over 150,000 national.  (*Id.*)  Furthermore, Ms.
Billery testified that if the ALJ found Plaintiff's testimony to be credible, she would not be able
to perform any work.  (R. at 62.)

Counsel asked Ms. Billery to consider the maximum number of days per month an

individual could miss work and still sustain employment in the unskilled labor market.  (R. at 62.)  Ms. Billery indicated that a person could miss two days at most in the unskilled market, and usually only one.  (*Id.*)

## V.  ADMINISTRATIVE DECISION

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act in her July 27, 2010 decision.  At the first step of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 25, 2007, the day Plaintiff filed her application.  (R. at 13.)

Next, the ALJ found that Plaintiff has the severe impairment of chronic headaches.  (*Id.*) The ALJ noted that Dr. Fischer found no convincing evidence of a severe physical impairment, but gave Plaintiff the benefit of the doubt with regard to her severe headaches.  (*Id.*)  The ALJ found, however, that Plaintiff's fibromyalgia was not a severe impairment.  (R. at 13.)  At step

---

[1]  Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

three, the ALJ then determined that Plaintiff does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (R. at 14.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional

capacity ("RFC").  The ALJ concluded that Plaintiff had the ability to perform a wide range of

light work, or work which is generally performed while standing/walking frequently (more or

less six hours in an eight-hour workday) and requires maximum lifting of twenty pounds

occasionally, ten pounds frequently.  (*Id.*)  The ALJ further provided that Plaintiff could never

climb ladders, ropes or scaffolds; could never balance; and could not drive as part of her

employment.  (*Id.*)  In reaching her conclusions regarding Plaintiff's RFC, the ALJ stressed that

the objective findings in the record failed to support Plaintiff's allegations of disabling

symptoms.  (R. at 16.)  The ALJ ultimately found that Plaintiff was not entirely credible to the

extent she alleged symptoms more severe than the RFC reflected.  (R. at 16.)  The ALJ gave the

opinions of Drs. Freihofner and Bolz some weight.  (R. at 17.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff raises two separate errors.  First, Plaintiff contends that the ALJ erred in finding that her headaches were not disabling.  Although labeled as a challenge to the ALJ's ultimate disability conclusion, Plaintiff essentially maintains that the ALJ erred in finding that she was not entirely credible with regard to her complaints of pain.  Second, Plaintiff contends that the ALJ erred in finding that Plaintiff's fibromyalgia was not a severe impairment.

13

A.    **Credibility**

The Sixth Circuit has provided the following guidance in considering an ALJ's

credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability
> claim, a two-part analysis is used in evaluating complaints of disabling pain.  20
> C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v.
> Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  First, the ALJ will ask whether there
> is an underlying medically determinable physical impairment that could reasonably
> be expected to produce the claimant's symptoms.  20 C.F.R. § 416.929(a).  Second,
> if the ALJ finds that such an impairment exists, then he must evaluate the intensity,
> persistence, and limiting effects of the symptoms on the individual's ability to do
> basic work activities.  *Id.*

*Rogers*, 486 F.3d at 247.

"The ALJ's assessment of credibility is entitled to great weight and deference, since he

[or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F.

App'x 469, 475 (6th Cir. 2008).  Despite this deference, "an ALJ's assessment of a claimant's

credibility must be supported by substantial evidence."  *Walters v. Comm'r Soc. Sec.*, 127 F.3d

525, 531 (6th Cir. 1997).  Furthermore, the ALJ's decision on credibility must be "based on a

consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An

ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear

to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight."  *Id.* at 248**.**

"Discounting credibility to a certain degree is appropriate where an ALJ finds

contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*,

127 F.3d at 531.  Furthermore, in addition to objective medical evidence, the Regulations list a

variety of factors an ALJ must consider in evaluating the severity of symptoms including a

14

claimant's daily activities; the effectiveness of medication; and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (report and recommendation later adopted).

In this case, given the lack of clear objective evidence, the ALJ's credibility assessment was critical to the ultimate disability decision. The ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, she was not entirely credible to the extent she alleged symptoms inconsistent with the ultimate RFC assessment. After highlighting the various factors for consideration in assessing credibility, the ALJ provided four basic reasons for finding Plaintiff not entirely credible. First, the ALJ concluded that the objective medical evidence did not support Plaintiff's allegations with regard to her allegations of disabling pain. Second, the ALJ provided that Plaintiff's daily activities were not as limited as one might expect given Plaintiff's complaints of pain. Third, the ALJ noted that Plaintiff was not compliant with the treatment recommendations of at least one physician. Finally, the ALJ stressed that none of Plaintiff's treating or examining physicians suggested that Plaintiff had limitations or restrictions beyond the ultimate RFC assessment.

Particularly with regard to Plaintiff's chronic headaches, the lack of supporting objective evidence provides at least some support for the ALJ's credibility determination. As Dr. Fischer emphasized, although Plaintiff had a long history of chronic headaches, her various physicians were unable to find an organic explanation for these headaches despite extensive testing. Furthermore, psychological evaluations did not provide any clear indication regarding the source

15

of Plaintiff's pain. Plaintiff is correct that there are limits to objective medical evidence in this area.[2] *See Miyoshi v. Bowen*, 696 F. Supp. 346, 350 (N.D. Ill. 1988) (emphasizing that "[m]igraine headaches are vascular in nature and do not necessarily produce the type of laboratory evidence that the ALJ seemed to demand").[3] Such limits do not mean, however, that lack of objective evidence is completely irrelevant in assessing the severity of a claimant's chronic headaches. *See, e.g.*, *Long v. Comm'r of Soc. Sec.*, 56 F. App'x 213, 214 (6th Cir. 2003) (holding, in the face of a migraine headache diagnosis but normal testing, that the claimant "did not introduce sufficient objective evidence to support the existence or severity of her allegedly disabling headaches."); *McCormick v. Sec'y of Health & Human Servs.*, 861 F.2d 998, 1003 (6th Cir. 1988) (upholding an ALJ's credibility finding because the "[c]laimant did not introduce objective medical evidence to support the existence or severity of the alleged migraine headaches"); *Stone v. Astrue*, No. 1:10–cv–236, 2011 WL 2635740, at *11 (May 6, 2011) (noting, in upholding an ALJ's credibility determination, that the claimant provided "no objective evidence . . . support[ing] her contention that she would have to miss multiple days per month from work because of migraine headaches") (report and recommendation later adopted).

Additionally, Plaintiff's daily activities provide at least slight support for the ALJ's credibility determination. On the whole, Plaintiff's daily activities are relatively minimal and

---

[2] Dr. Fischer acknowledged that "the cause of many headaches remains obscure." (R. at 55.)

[3] Although Plaintiff relies heavily on *Miyoshi*, the undersigned finds the circumstances of this case to be distinguishable. In *Miyoshi*, the plaintiff did not rely solely on her own subjective allegations to establish the severity of her headaches. Rather, her treating physician issued an opinion, based on his treatment history with the plaintiff, regarding the debilitating nature of her headaches. *Miyoshi*, 696 F. Supp. at 348. The *Miyoshi* court stressed that the ALJ's credibility decision went against "uncontradicted medical testimony." *Id.* at 350.

certainly, in and of themselves, do not support a finding that Plaintiff is capable of competitive work.  Furthermore, it appears that Plaintiff engaged in certain activities, such as dog grooming and her college courses, in a flexible manner to allow for adjustment based on her level of pain.  Nevertheless, a few of Plaintiff's activities provide at least some reason for questioning Plaintiff's subjective complaints.  For example, despite testifying to daily headaches and problems concentration, Plaintiff indicated that reading was one of her main hobbies and activities to pass the time.  In June 2007, after filing for disability, Plaintiff indicated that she babysat on weekdays from 2:00 to 6:00; helped care for her family's nine dogs; and performed some chores such as laundry and dishes.  (R. at 186–88.)  Additionally, in July 2007, Plaintiff indicated to Dr. Heiskell that she was babysitting two to three days a week for day-long periods.  (R. at 395.)  Although it is possible to reconcile such activities with Plaintiff's testimony,[4] these activities suggest some reason for inferring that Plaintiff's symptoms were not as severe as she indicated.

The ALJ also based her credibility determination in part on Plaintiff's failure to comply with her physician's instructions.  As the Commissioner stresses, a claimant's "statements may be less credible . . . if the medical reports or records show that the individual is not following the treatment as prescribed . . . ."  SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996).  In this case, Dr. Banerjee, who treated Plaintiff for irritable bowel syndrome, indicated that Plaintiff had failed to comply with the dietary restrictions he recommended.  Admittedly, Plaintiff's disability claim focused on her chronic headaches and fibromyalgia.  Nevertheless, Plaintiff listed irritable

---

[4]  For example, Plaintiff indicated at the hearing that she often has to re-read material due to her trouble concentrating.  (R. at 43.)

bowel syndrome as one of the reasons she was unable to work within her application, and testified regarding the condition at the administrative hearing.  (R. at 41, 167.)  Accordingly, Plaintiff's failure to comply with treatment regarding this condition provides some, although minimal, grounds for discrediting her credibility.

Finally, the lack of supporting opinion evidence within the record suggests that Plaintiff's subjective complaints may not be entirely credible.  *See Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) ("Given that none of [the claimant's] doctors reported functional or work related limitations due to her headaches, there was a basis to question [the claimant's] credibility.").  Specifically, as the ALJ recognized, none of Plaintiff's physicians limited or restricted Plaintiff's activities within their treatment records.  Nor has Plaintiff provided any medical opinion evidence indicating that she is incapable of light work.  Rather, the reviewing evaluations of Drs. Freihofner and Bolz actually provided that Plaintiff was capable of medium work.  Furthermore, Dr. Fischer suggested that many people with severe migraine headaches, if not most, are able to continue to work despite the condition.  (R. at 57.)

Given the combination of these factors, the undersigned concludes that substantial evidence supports the ALJ's credibility assessment.  In reaching this determination, the undersigned recognizes that this is not a case where the record presents an obvious, clear-cut reason for discounting Plaintiff's credibility.  Additionally, many of the factors the ALJ relied upon to discount Plaintiff's credibility, standing alone, appear to be of minimal probative value.  At the same time, however, outside of Plaintiff's subjective complaints, the record evidence provides little, if any, reason to conclude that Plaintiff is incapable of light work.  In light of the combination of factors outlined above, as well as the general deference the Court must give to

the ALJ in the area of credibility, the undersigned finds that the ALJ was reasonable in concluding that Plaintiff's testimony as to the severity of her symptoms was not entirely credible.[5]

**B.      Fibromyalgia**

In her second contention of error, Plaintiff maintains that the ALJ should have found her fibromyalgia to be a severe impairment.  The Commissioner, on the other hand, maintains that Plaintiff failed to provide evidence that her fibromyalgia is severe and that any error in this regard was not reversible.

At step two of the sequential evaluation process, the Commissioner must consider whether a claimant has a severe impairment.  20 C.F.R. § 416.920(a)(4).  "To surmount the step two hurdle, the applicant bears the ultimate burden of establishing that the administrative record contains objective medical evidence suggesting that the applicant was 'disabled,' as defined by the Act . . . ."  *Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 929 (6th Cir. 2007).  The Regulations generally define severe impairment as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  20 C.F.R. § 416.921(b).

The United States Court of Appeals for the Sixth Circuit has generally described step two of the evaluation process as "a *de minimus* hurdle."  *Simpson v. Comm'r of Soc. Sec.*, 344 F.

----

[5]  In light of the ALJ's credibility finding, the undersigned also concludes that the ALJ was justified in limiting Plaintiff to a reduced range of light work, as detailed within the RFC assessment.  Given the ALJ's conclusion that Plaintiff was not entirely credible, the ALJ was not required to find that Plaintiff would miss at least one or two days of work per month, as Plaintiff contends.  Outside of her subjective complaints, Plaintiff fails to highlight any evidence that would require such a conclusion.

19

App'x 181, 190 (6th Cir. 2009) (internal quotations omitted). Accordingly, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* (internal quotations omitted). The mere existence of impairments, however, does not establish significant limitation in "performing basic work activities for a continuous period of time." *Despins*, 257 F. App'x at 930. Furthermore, in considering whether a claimant has a severe impairment, an ALJ need not accept unsupported medical opinions or a claimant's subjective complaints. *McDaniels v. Astrue*, No. 1:10–CV–699, 2011 WL 5913973, at *4 (S.D. Ohio Nov. 28, 2011).

"After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-3p, 1996 WL 374181 at *1 (July 2, 1996)). Consequently, the Sixth Circuit has provided that "when an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two does not constitute reversible error." *Id.* (internal quotations omitted).

Finally, it is important to acknowledge the unique characteristics of fibromyalgia. Specifically, fibromyalgia poses unique challenges because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243. "The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials." *Id.* at 244. Nevertheless, as with any other impairment, the mere existence of fibromyalgia does not guarantee that a claimant will have a severe

20

impairment. *Cf. Dragan v. Astrue*, No. 1:11–cv–44, 2011 WL 7430207, at *6 (S.D. Ohio Dec.

15, 2011) ("[T]he ambiguities inherent in the diagnosis does not mean that every suggestion of

fibromyalgia requires a conclusion that the condition is 'severe' or that it results in disability.")

(report and recommendation later adopted); *Foutty v. Comm'r of Soc. Sec.*, No. 5:10 CV 551,

2011 WL 2532915, at *7 (N.D. Ohio June 2, 2011) (affirming an ALJ's finding of no severe

fibromyalgia impairment based in part on the ALJ's credibility finding) (report and

recommendation later adopted).

  In this case, the undersigned finds that substantial evidence supports the ALJ's severe

impairment finding. Relying on the opinion of Dr. Fischer, the ALJ found that Plaintiff's

fibromyalgia was not a severe impairment. The record evidence is consistent with such a

conclusion. Although the record contains several diagnoses of fibromyalgia, it provides little

indication, outside of Plaintiff's subjective complaints, that the condition limits her work

abilities. Once again, none of Plaintiff's treating or examining physicians issued opinions

limiting her work abilities based on fibromyalgia. Furthermore, treatment notes from Dr. Kataria

reflect that Plaintiff's fibromyalgia was responding, at least to some degree, to medication. (R.

at 475, 481.) Dr. Bolz found that Plaintiff was capable of medium-level work despite her

fibromyalgia and headaches. (*See* R. at 420.) Additionally, Dr. Fischer, who also considered

Plaintiff's fibromyalgia, testified that there was no evidence of a severe physical impairment.

Finally, as detailed above, substantial evidence supports the ALJ's finding that Plaintiff's

subjective complaints were not entirely credible.[6] *Cf. Swain v. Comm'r of Soc. Sec.*, 297 F.

---

[6] The Court recognizes that given the nature of fibromyalgia, lack of traditional objective findings is not persuasive in considering a claimant's credibility. *See Rogers*, 486 F.3d at 248 (holding that the nature of fibromyalgia renders an "over-emphasis upon objective findings

Supp. 2d 986, 990 (N.D. Ohio 2003) (holding that fibromyalgia "places a premium . . . on the assessment of the claimant's credibility").

Even assuming that the ALJ should have found fibromyalgia to be a severe impairment, this conclusion alone does not constitute reversible error.  Because the ALJ found Plaintiff's headaches to be a severe impairment, she went on to assess Plaintiff's RFC.  The ALJ clearly recognized the all-inclusive nature of the RFC analysis, and explicitly referenced Plaintiff's fibromyalgia within her RFC assessment.  More specifically, the ALJ considered evidence regarding Plaintiff's fibromyalgia treatment in assessing whether Plaintiff's allegations of disabling symptoms were supported.  Accordingly, under these circumstances, the Court finds that, despite finding fibromyalgia to be a non-severe impairment, the ALJ adequately considered Plaintiff's fibromyalgia within the remainder of her decision.

## VIII.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **AFFIRM** the decision of the Commissioner.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.

---

inappropriate").  Although the ALJ's credibility determination focused on various test results with regard to Plaintiff's headaches, she also emphasized that Dr. Kataria's treatment notes reflected that Plaintiff's fibromyalgia was responding to medication.  (R. at 16.)

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   July 31, 2012                         ____/s/ *Elizabeth A. Preston Deavers*____
                                       Elizabeth A. Preston Deavers
                                       United States Magistrate Judge